## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| **KRYSTAL L. BOXUM-DEBOLT and** | ) | |
| **LISA ANNE MOORE,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **CIVIL ACTION** |
| **v.** | ) | |
| | ) | **No. 12-2641-KHV** |
| **CHADWICK J. TAYLOR, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## MEMORANDUM AND ORDER

Krystal L. Boxum-Debolt and Lisa Anne Moore bring suit against Chadwick J. Taylor in his official capacity as District Attorney ("DA") for the Third Judicial District of the State of Kansas; Shawnee County, Kansas.[1] Plaintiffs assert official capacity claims under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq., for gender/sex discrimination, associational race discrimination and retaliation.[2] See Pretrial Order (Doc. #80) at 8. This matter

---

[1]     Plaintiffs also sue Shawnee County, Kansas and Shawnee County Board of Commissioners Ted Ensley, Mary M. Thomas and Shelly Buhler, in their official and individual capacities, for violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 et seq.  See Pretrial Order (Doc. #80) filed February 9, 2016.

[2]     Plaintiffs originally asserted claims against Taylor in his official and individual capacities as follows: (1) under Title VII, for gender discrimination, associational discrimination and retaliation; under 42 U.S.C. §§ 1983 and 1985, for violation of constitutional rights to substantive and procedural due process, freedom of speech and equal protection and conspiracy to violate those rights; and (3) under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 et seq., for willful denial of overtime wages.  See Complaint (Doc. #1) filed October 1, 2012.

On September 30, 2013, the Court dismissed (1) against Taylor in his official capacity, claims under Sections 1983 and 1985 and the FLSA, see Memorandum And Order (Doc. #24) at 8-9; and (2) against Taylor in his individual and official capacities, claims for violation of First Amendment rights and conspiracy under Section 1985.  See id. at 10-11, 15.  In addition, the Court granted Taylor qualified immunity on the Section 1983 claims.  See id. at 14.

(continued...)

is before the Court on Taylor's <u>Motion For Summary Judgment</u> (Doc. #83) filed February 26, 2016.

For reasons stated below, the Court sustains the motion in part.

## I.     Legal Standards

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  <u>See</u> Fed. R. Civ. P. 56(c); <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247 (1986); <u>Hill v. Allstate Ins. Co.</u>, 479 F.3d 735, 740 (10th Cir. 2007).  A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law."  <u>Liberty Lobby</u>, 477 U.S. at 248.  A "genuine" factual dispute requires more than a mere scintilla of evidence in support of a party's position.  <u>Id.</u> at 252.

The moving party bears the initial burden of showing the absence of any genuine issue of material fact.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986); <u>Nahno-Lopez v. Houser</u>, 625 F.3d 1279, 1283 (10th Cir. 2010).  Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial as to those dispositive matters for which the nonmoving party carries the burden of proof.  <u>Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.</u>, 912 F.2d 1238, 1241 (10th Cir. 1990); <u>see also</u> <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586-87 (1986).  To carry this burden, the nonmoving party may not rest on the pleadings but must instead set forth specific facts supported by competent evidence.

---

[2](...continued)

On October 15, 2013, plaintiffs agreed to dismiss all Title VII claims against Taylor in his individual capacity.  <u>Plaintiffs' Response To Order To Show Cause</u> (Doc. #28).  On January 29, 2015, the parties stipulated to dismiss the FLSA claims against Taylor in his individual capacity. <u>Joint Stipulation Of Dismissal Of FLSA Claims Against Defendant Chadwick J. Taylor, Individually</u> (Doc. #37).

Nahno-Lopez, 625 F.3d at 1283.

The Court views the record in the light most favorable to the nonmoving party.  See Deepwater Invs., Ltd. v. Jackson Hole Ski Corp., 938 F.2d 1105, 1110 (10th Cir. 1991).  It may grant summary judgment if the nonmoving party's evidence is merely colorable or is not significantly probative.  See Liberty Lobby, 477 U.S. at 250-51.  In response to a motion for summary judgment, a party cannot rely on ignorance of facts, speculation or suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial.  Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988); Olympic Club v. Those Interested Underwriters at Lloyd's London, 991 F.2d 497, 503 (9th Cir. 1993).  The heart of the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law."  Liberty Lobby, 477 U.S. at 251-52.

## II.    Facts

The following facts are uncontroverted, deemed admitted or construed in the light most favorable to plaintiffs.[3]

### A.    Plaintiffs' Positions In DA Office

From 2005 to May of 2006, Boxum served as an unpaid intern in the DA office.  In the fall of 2006, Boxum returned to the office as a part-time paid intern in the victim/witness unit.  The record does not establish how long Boxum remained in this position.  On August 18, 2008, the DA office "rehired" Boxum to permanent full-time status.[4]  At that time, Robert Hecht served as DA.

---

[3]    The Court includes only those facts which are material to defendant's motion and disregards any facts which are not supported by record citations.

[4]    The record does not establish when Boxum left the DA office or who rehired her.

Boxum understood that her position was "at-will," i.e. she did not have an employment contract.

In November of 2008, the citizens of Shawnee County, Kansas elected Taylor to serve as DA.  After the election, Boxum re-applied for her position in the victim/witness unit.  After an interview with Taylor and others, Taylor informed Boxum that she would continue in the position.

In January of 2009, Taylor began his term in the DA office.  As DA, Taylor had complete discretion and authority to determine his staff.  He did not need permission from anyone to hire or fire an employee.

On March 16, 2009, Jackie Spradling became chief deputy. In this position, Spradling was second in charge at the DA office.  When Taylor was absent, Spradling was responsible to run the office.

In June of 2009, Moore began working at the DA office for $14.00 an hour.[5]  On November 2, 2009, Taylor offered her a position as victim/witness specialist at the same rate of pay. On November 9, 2009, Moore began work in the new position.

As victim/witness specialist, Moore's duties included contacting victims; attending the first appearance docket and helping victims decide if they wanted a no contact order; helping victims with resources; attending court hearings; assisting with crime victim compensation applications; helping victims prepare to testify in consultation with the prosecutor on the case; assisting with restitution paperwork; coordinating and recruiting volunteers and community outreach.[6] The duties of victim/witness specialists also included coordinating with attorneys to make sure that witnesses

---

[5]    The record does not indicate what position Moore initially held at the DA office.

[6]    Moore's community outreach work involved efforts to recruit volunteers to work at the DA office.

and victims were available to participate in court hearings and trials.

During her employment at the DA office, Moore recruited, trained and supervised volunteers.

In 2009 and 2010, Heather Whitton supervised employees in the victim/witness unit, including plaintiffs. Whitton had authority to assign work and redirect work of employees in the unit. Various people in the DA office – including attorneys, administrative assistants and Taylor – informed plaintiffs of projects that needed their attention.

In 2009 and 2010, Dakota Loomis served as deputy chief of staff.

In 2010, Richard Lee McGowan became chief of staff. At that time, the DA office had 70 employees. One-third of the employees were attorneys and the rest were support staff.

In the summer of 2010, Taylor's "inner circle" included Spradling, McGowan and Loomis. Spradling and McGowan were Taylor's "right-hand" and "left-hand" people. Taylor also regularly consulted with Matt Patterson, a senior assistant DA. Under the inner circle, unit heads managed or supervised various units within the DA office. Taylor relied on direct supervisors, i.e. his "command staff team," to make termination decisions. Whitton was a member of the command staff team. The following people served above Whitton in the chain of command: Loomis, McGowan, Spradling and Taylor.

Boxum and Moore were not members of the inner circle or management. Moore was considered an "entry level" employee. Declaration of Lisa Moore ¶ 3, Exhibit 14 to Plaintiffs' Memorandum Of Law In Opposition To Defendant Taylor's Motion For Summary Judgment ("Plaintiff's Response") (Doc. #88) filed April 22, 2016. She did not regularly discuss or interact with Taylor regarding work assignments. Id. ¶ 4. Once or twice, she discussed work assignments one-on-one with Taylor. A few times, she and Taylor discussed work in the presence of others.

Id. ¶ 4.  Boxum did not regularly discuss work assignments with Taylor.  Declaration of Krystal Boxum-Debolt, Exhibit 15 to Plaintiff's Response (Doc. #88) ¶ 2.  Occasionally, Taylor came into the victim/witness unit where she worked.  Id. ¶ 3.  He would usually go into Whitton's office and did not normally stop to talk with Boxum about her assignments or other duties.  Id. ¶ 3.

### B.   Events Leading To Termination Of Plaintiffs' Employment

In December of 2009 or early 2010, Whitton asked Mary Morales, a subordinate Hispanic employee, to clean her home.  Morales began doing so.  After the birth of Whitton's child,[7] Morales began babysitting for her.

Between May 24, 2010 and early June of 2010, plaintiffs approached Loomis to ask for a breastfeeding room on behalf of a co-worker.[8]  Moore provided a copy of a statute which required such a room.  Loomis took the matter to Taylor.  Loomis Depo. at 88:17-22.  Loomis thinks that he would have told Taylor that plaintiffs had raised the issue.  Id. at 89:2-5.  When Loomis raised the issue, it became apparent that Taylor thought it was a "crazy bullshit issue" in which Loomis should have no part.  Id. at 89:10-14.  Taylor cut off Loomis and told him to stay out of it, i.e. that Taylor did not need to deal with this type of stuff and that Loomis should not be dealing with these crazy women who were asking or demanding things that he did not need to address.[9]  Id. at 85:11-22.

In the spring or early summer of 2010, Loomis informed Taylor that the Patient Protection

---

[7]    The record does not reveal when the child was born.

[8]    The record does not reveal the name of the co-worker.  Apparently, she had been using a vacant office for privacy but Loomis had moved into or was moving into that office.

[9]    Taylor testified that he was not upset in any way that Loomis had raised the issue and that until this lawsuit, he did not know that plaintiffs had raised the issue with Loomis.  Taylor Depo., Plaintiffs' Exhibit 1, at 43:6 to 44:17.

and Affordable Care Act ("ACA"), P.L. 111-148 (2010),[10] required employers of more than 50 people to provide a privacy space for nursing mothers.  Until Loomis raised the issue, Taylor was not aware of the need for a privacy room.  After determining that the ACA requirement applied to the DA office, Taylor advised Rich Davis, the Shawnee County courthouse facilities manager, to provide a private space.  Taylor understood that Davis would soon make such a space available in the courthouse.

In May or June of 2010, Morales told Loomis, plaintiffs and Sue Murphy, another victim/witness specialist, that Whitton was treating her unfairly because of her race.  More specifically, Morales told Loomis that she was uncomfortable with her arrangement to clean and babysit for Whitton.  Morales was concerned that if she stopped performing these tasks, Whitton would treat her coldly, rudely and unfairly at work.  Morales told plaintiffs and Loomis that she believed that Whitton had asked her to babysit and clean because she is Hispanic.  Morales said that she was considering leaving the DA office to avoid Whitton's pressure to clean and babysit for her.  Loomis did not immediately report the conversation to anyone else.

On June 22, 2010, Morales gave notice to quit her job at the DA office.  Part of her reason for quitting was her inability to tell Whitton "no" with respect to cleaning and babysitting work.  After Morales gave notice, Loomis talked with her about providing letters of recommendation.  Morales again expressed discomfort with Whitton.

At the end of June or early July of 2010, Whitton asked Morales to schedule a meeting with

---

[10]     The ACA amended Section 7 of the FLSA to require employers to provide reasonable break time and private space for employees to express breast milk for nursing children.  See 29 U.S.C. § 207(r).

Carantina,[11] the widow of a victim in a murder case which the DA was prosecuting.  Carantina is Hispanic and does not speak English.  Through Morales as interpreter, Whitton asked Carantina if she would be willing to clean Whitton's house.

On July 2, 2010, Morales expressed concern to plaintiffs regarding the fact that Whitton had asked Morales to schedule and interpret the meeting with Carantina.  Morales told Moore that she was uncomfortable asking Carantina to work for Whitton and felt pressure to please Whitton.

On July 8 or 9, 2010, Morales spoke to Loomis about Whitton asking her to call Carantina to come in and talk about housecleaning.  Morales was visibly upset and crying and had difficulty telling Loomis what had happened.  Loomis told Morales that she needed to report the matter to Spradling and/or McGowan.  Morales's last day in the office was Friday, July 9, 2010.

On Saturday, July 10, 2010, Moore visited the Emergency Room ("ER") with symptoms of double vision, dizziness, muffled hearing in one ear, numbness, tingling and a mild headache.  The ER physician was not concerned with her test results, thought that the symptoms would fade and recommended that she follow up with a neurologist.

On Monday, July 12, 2010, Moore reported to work.  She told Whitton about her visit to the ER room and her follow-up appointment scheduled for July 22, 2010.  Moore stated  that she continued to experience double vision and planned to go home early because she had a headache.

At 4:00 p.m., after Whitton had left for the day, Boxum went to Spradling and reported that Morales thought that Whitton had hired her to do domestic work because she was Hispanic, and that Morales felt like she could not refuse because Whitton was her boss.  Boxum also expressed concern that Whitton had hired Carantina, a victim served by the victim/witness unit, and that Carantina

---

[11]       The record does not reflect whether Carantina is her first or last name.

might not understand her rights due to a language barrier and might feel indebted or that Whitton had taken advantage of her.  Boxum told Spradling that Moore also planned to speak with her.

The next day, on July 13, Moore returned to work intending to work a full day.  Whitton asked Moore for details concerning her symptoms.  Moore responded by email.  Whitton asked for more detail and Moore sent a second email with more information.

Around 4:00 p.m., Taylor placed Moore on medical leave.  Taylor said that he had spoken with HR and believed that her symptoms were a liability.  He said that he was placing her on medical leave and that she would need a doctor's clearance to return to work.  He advised that until she returned to work, she could use sick leave and vacation time.

Moore returned to the victim/witness unit to wait for a ride home.  At that time, Whitton took the Blackberry which Moore used for work and began scrolling through her messages and taking notes.  The most recent messages were exchanges between Moore and Boxum regarding Boxum's conversation with Spradling and Boxum encouraging Moore to have courage to speak with Spradling about "the things" that Whitton had done.

Shortly thereafter, Taylor entered the victim/witness unit and ordered Moore to leave the DA office immediately.  After Moore left the office, Taylor instructed Whitton to log onto Moore's computer and figure out what she had been deleting.[12]  Whitton thereafter logged onto Moore's computer and printed alleged emails between Moore and Boxum and presented them to Taylor.

Before Boxum left the office on July 13, Whitton told her not to worry "about deleting shit, I already have it."  Boxum Depo. at 71:25 to 72:4.  Whitton knew the password for Boxum's email

---

[12]      Taylor testified that after he placed Moore on medical leave, Whitton called him and said that there was a problem and Moore would not leave the office and was instead sitting at her computer and deleting emails.  Moore denies deleting any emails.

and Boxum knew that she had gotten into her work emails before.

On the evening of July 13, Whitton gave Taylor some emails.[13]  That evening, Taylor reviewed the emails and consulted with Patterson, who had previously practiced in employment litigation.  Taylor told Patterson that they had a problem in the victim/witness unit.  Patterson recommended that they do a complete investigation to "see what's going on in [the] unit and get [their] arms around the scope of the problem."  Patterson Depo. at 29:11 to 30:5.  Taylor and Patterson decided to separate everyone in the unit to determine what was going on.

Patterson assisted Taylor with an investigation into the victim/witness unit.  During the investigation, it became a "common theme" that if an employee did something to upset Whitton, she would "retaliate" and ignore the employee for the rest of the day.

Early in the investigation, Patterson reviewed emails that Boxum and Moore allegedly wrote each other.  From the emails, Patterson gleaned that they were discussing (1) the fact that they were extremely unhappy about working in the DA office; (2) that they had been intoxicated at events in the community; and (3) derogatory comments about other employees in the office.  Patterson Depo.

---

[13]     The record does not establish what emails Whitton gave Taylor.  Taylor contends that she gave him the emails contained in Defendant's Exhibit 11, i.e. Spradling Exhibit 1- Investigative File, but he provides no record support for the assertion.  See Memorandum In Support Of Taylor's Motion For Summary Judgment ("Defendant's Memorandum") (Doc. #84) filed February 26, 2016 at 40 (citing Taylor Depo. at 33:3-16).

Taylor quotes three pages of email communication that he contends he found inappropriate, but he provides no record support for his assertion.  See Defendant's Memorandum (Doc. #84) at 3-6 (citing Taylor Depo. at 255:18 to 256:13 (discussing email of April 2, 2010)).  One of the emails which Taylor found inappropriate was an email from Boxum to Moore dated April 2, 2010, which stated, ""I am already so fucking annoyed with Sue."

at 35:7-25.  Taylor asked Patterson if it would be good to place Boxum on administrative leave.[14] Based on the emails that he had reviewed, Patterson agreed.

First thing in the morning on July 14, Taylor spoke with Loomis.  Taylor told Loomis that he needed to be aware of a situation in the victim/witness unit involving Boxum, Moore and Whitton. More specifically, Taylor described it as "a big mess between all these women who couldn't get along or [were] fighting about something."  Loomis Depo. at 65:11-24.  Loomis did not mention anything about Morales at this meeting.

Also in the morning of July 14, Taylor met with Boxum.  He told her that something was going on in the victim/witness unit and that he had a stack of emails on his desk and needed to figure out what was going on.  Boxum replied, "yes, there is something, it needs to be looked into with [Whitton]."  Boxum Depo. at 77:17-25.  Taylor gave Boxum a letter which stated that he was placing her on administrative leave pending the outcome of an internal investigation.  Based on her conversation with Taylor, Boxum believed that he was placing her on leave because of her conversation with Spradling two days earlier.  Boxum was under the impression that perhaps Taylor was placing everyone in the unit on leave and not just her and Moore.  Boxum did not understand or have an impression that the DA office was investigating her.[15]

Taylor testified that after he placed Boxum on leave, Spradling came to his office, provided some documents[16] and told him about her discussion with Boxum about Morales cleaning Whitton's

---

[14]    The record does not establish when Taylor asked Patterson about placing Boxum on administrative leave.

[15]    Likewise, Moore had no idea that she was under investigation.  Moore thought that Whitton was under investigation.

[16]    Taylor did not recall the substance of the paperwork, except that one document was
(continued...)

house.  Taylor Depo. at 45:6-13.

At 10:00 a.m., after Taylor had place Boxum on leave, Spradling sent Taylor an email which

stated as follows:

> [Boxum] came into my office near the end of the day on Monday, July 12, 2010 and closed my door.  Through occasional tears, she indicated there were problems with Heather Whitton.
>
> The specifics were that a previous employee in the victim/witness unit, Mary Morales, was asked by Whitton to clean Whitton's house and babysit her children, for pay.  [Boxum] indicated Morales told her she accepted Whitton's offer of employment only because she felt like she could not turn [Whitton] down since [Whitton] was her boss.
>
> [Boxum] also indicated the widow of a pending homicide case [Carantina] was asked by Whitton if she knew anyone who would be interested in cleaning Whitton's home. [Carantina] was in the office during a victim/witness contact when she was the victim.
>
> [Boxum] said [Carantina] told Whitton she would clean Whitton's house, and had began doing so.
>
> [Boxum] also told me Whitton had only recently (July 9th) asked that she be removed as the contact person from the pending criminal case where Whitton's sister is the victim.
>
> [Boxum]  concluded her talk with me by saying there were additional problems that Lisa Moore could relate to me.
>
> I told [Boxum] we wanted the victim/witness unit to be healthy and serve its function of helping victims, and that if there were problems Lisa Moore was having, then [Moore] should come and talk to me.  [Moore] never did.
>
> [Boxum's] discussion included her giving me three pieces of paper, two emails and one Justware printout.  I've given these three to you.

---

[16](...continued)
"a JustWare printout because there was a complaint that Whitton was a person of interest from the unit on a case that involved a potential family member of hers or a cousin or something."  Taylor Depo. at 46: 21 to 47:4.

-12-

Email from Spradling to Taylor dated July 14, 2010, Defendant's Exhibit 11.

After speaking with Spradling, Taylor called Patterson.  After some discussion, they decided to first talk with Morales.  Taylor and Patterson went to Morales' home, but no one answered the door.  At 10:37 a.m., Taylor left a note asking her to call him.  When Taylor returned to the office, he learned that Morales had called at 10:55 a.m. and advised that she was in California and wanted to know what was going on.  Taylor and Patterson interviewed Morales over the phone.  Morales told them that she had been uncomfortable when Whitton had her ask Carantina to clean Whitton's house.

After speaking with Morales, Taylor and Patterson developed a plan to meet with Boxum and Moore in a neutral location to "figure out why they feel the way that they do, why they did what they did, and see who else they would recommend that we talk to," and then speak with everyone that plaintiffs named.  Taylor Depo. at 87:17-88:9.

After the meetings on July 14, Taylor told Loomis that there was a bunch of "petty bullshit" between staff in the victim/witness unit and that these were women who just could not get along and were creating problems against each other.  Loomis Depo. at 94:7-23.  Taylor described them as "stupid women" fighting over "stupid shit."  Id.  Taylor said that if he fired all the women, these problems would stop.  Id. at 104:22 to 105:5.  Taylor said that hiring women in general was a problem and that if he did not have to hire women he would not do it, especially female attorneys.  Id. at 103:12-15.  Taylor commented that women have children and then became a problem because they would have to miss work to stay home with sick children.  Id. at 104:3-7.

On July 16, Taylor interviewed Boxum and Moore at the Douglas County DA office.  Patterson sat in on the meetings. From 11:30 a.m. to 12:08 p.m., Taylor interviewed Boxum.  Most

-13-

of the discussion centered on what Boxum told Spradling on July 12.  Boxum told Taylor about Morales cleaning Whitton's house and feeling like Whitton had singled her out for the job because of her race.  Taylor asked Boxum why she hated her job.  Boxum replied that she loved her job, but the working conditions were hostile, fear-based and unhealthy.  During the last few minutes, Taylor asked if it is appropriate to send emails that speak negatively about co-workers and talk about an employee's sex life.  The questions were generic and did not refer to specific emails.  Boxum replied "no" and asked to review the emails to which he might be referring.  She stated that they may have been taken out of context or if Whitton was the source, she may have altered them because she had done that before.  Taylor refused to show her any emails.

From 12:10 p.m. to 12:43 p.m., Taylor interviewed Moore.  Moore told him that Morales had raised concerns that Whitton had singled her out for baby-sitting and housecleaning because of her race.  Taylor asked Moore if it is appropriate to (1) send emails over work computers concerning people's sex lives, (2) use office email to make derogatory comments about someone's physical appearance and (3) talk about one's sex life over work email.  The questions were generic and did not refer to specific emails.

After interviewing plaintiffs, Taylor spoke to Loomis with Patterson present.  Loomis told Taylor about Whitton hiring Morales and Carantina to clean her home, and that plaintiffs had told him that Morales believed that Whitton was motivated by racial factors.  Loomis also expressed his opinion that it was inappropriate for Whitton to hire Morales and Carantina to work for her.  Loomis pointed out that they were both young Hispanic women, which could be a problem.

After Taylor interviewed plaintiffs and other employees, he interviewed Murphy.[17]  Murphy

reported as follows:

a)    That it was my impression that [Boxum] and [Whitton] were friends.  However, over time, I began to think that [Boxum] and [Moore] weren't interested in working for [Whitton] and that they wanted to see her fired or removed from the unit.

b)    It was my belief that [Boxum] wanted [Whitton's] job and there was definite tension between [Whitton] and [Boxum].  Likewise, it was my belief that [Moore] thought she would then be promoted to [Boxum's] job if [Whitton] were fired or removed.  I described this as a "coup."

c)    Around this time, [Whitton] went on maternity leave.  While [Whitton] was on leave, [Boxum] began to assert herself like a supervisor and started making changes within the unit.

d)    Once [Whitton] returned from maternity leave, [Boxum] began to be more vocal in her disagreements with [Whitton].  If [Boxum] disagreed with a decision that [Whitton] had made, she wouldn't let the issue drop and defer to [Whitton] as the supervisor of the unit.  It was my impression that [Whitton] began to feel threatened by [Boxum].

e)    It was also during this time that [Boxum] began to date [Loomis].

f)    During my time in the [DA office], I also worked with [Morales].  I was aware that [Morales] had done work for [Whitton] outside of the office in order to make extra money.  That included some general house cleaning and babysitting.  It was my belief that this was [a] completely voluntary arrangement . . . that had nothing whatsoever to do with their work at the [DA office].

Declaration Of Sue Murphy ¶ 4, Defendant's Exhibit 10.[18]  Taylor took notes of his meeting with

Murphy.  The notes do not suggest that plaintiffs were planning a coup against Whitton.  During

plaintiffs' interviews, Taylor did not ask about an alleged coup or plot to overthrow Whitton.

---

[17]    Murphy stopped working at the DA office in June of 2010.

[18]    Plaintiffs dispute the truth of Murphy's assertions, but they present no evidence that controverts Murphy's declaration that she made such statements to Taylor.  See Plaintiffs' Response (Doc. #88) at 51-56.

On August 2, 2010, Taylor met with Boxum and told her that she could quit or be fired. Boxum asked for time to talk with someone to decide.  Taylor said "no."  Boxum opted to be fired.

On the same day, Taylor met with Moore and gave her the same choice.  Taylor said that based on email communication, he had enough information to fire her and that the discussion was about how they would part ways.  Moore opted to resign.

In deciding to fire plaintiffs, Taylor claims that he relied on emails provided by Whitton. Plaintiffs contend that the emails are a pretext for discrimination and retaliation.  Taylor repeatedly denied plaintiffs' requests to see or explain the emails on which he claimed to rely.  Plaintiffs told Taylor that (1) the emails may have been taken out of context; and (2) if the emails came from Whitton, she may have altered them because she had been known to do that.  Taylor did not check whether Whitton had pulled favorable emails or ones that might support a decision not to fire plaintiffs.  Taylor did not look at emails of any other employees; he made no attempt to pull emails from other employees in the unit to see whether plaintiffs' emails were similar to or different from those of other employees in the unit.  Also, Taylor did not look into the environment of the victim/witness unit to see if other employees were making derogatory or unprofessional comments about fellow workers.  From 2009 to 2015, plaintiffs were the only employees whom Taylor singled out and fired for these types of alleged emails.

Prior to their terminations, plaintiffs had never been written up for any kind of disciplinary, performance or behavior issues.

In his deposition, Taylor described Whitton's conduct with regard to Morales and Carantina as improper and involving "extremely poor judgment."  Taylor Depo. at 57:1 to 60:9; 223:6 to 224:2.  Taylor testified that he discussed the matter with Whitton and orally reprimanded her.  Id.

-16-

He made no notes of their conversation and took no other disciplinary action against Whitton.  Id. at 28:20 to 60:9; 276:19-21; 278:2-22.  Taylor testified that "it was very apparent that it would be time for [Whitton] to be moving along."  Id. at 59:10-11.  During the investigation, Taylor did not document that he interviewed Whitton about allegations that she had engaged in race discrimination.

### C.   Working Environment At DA Office

When Moore worked at the DA office, it was common for managers, including Taylor, to make derogatory remarks about women.  Moore heard Taylor refer to a woman as "bitch" and call women "feminazis."  At times when Moore was present, Taylor did not correct other DA employees who referred to women as looking like "sluts," "whores" or "strippers."  On one occasion, Taylor referred to a woman's "tits hanging out."

When Taylor disagreed with decisions by female attorneys or female staff, he made comments that women were "irrational, crazy" and that "this is how women behave."  Loomis Depo. at 103:2-11.  If Taylor was having disagreements with women, he would commonly refer to them in derogatory terms, mostly related to sexuality, along the lines of "rug muncher," "dyke" and "bull-dyke."  Id. at 105:6-18. Taylor spoke in these terms regardless of the person's sexuality.  Id. at 106:20-25.  Less commonly, he would refer to a woman as "bitch."  Id. at 105:6-18.  Oftentimes, Taylor would speak in derogatory terms about women generally.  Id. at 105:19-23.  Taylor had particular animus toward women attorneys who worked for victims' rights organizations; he often referred to them as "dykes," "lesbians" and "bitches."  Id. at 103:15 to 104:2.

The DA office had "a certain level of nastiness . . . specifically related to women."  Loomis Depo. at 109:16-19.  It was a constant refrain.  Id. at 109:19-20.  Under the environment created by Taylor, women were referred to in derogatory terms and seen as irrational, crazy human beings.  Id.

-17-

at 110:2-7.

### III.    Analysis

Against defendant in his official capacity, plaintiffs assert claims under Title VII for gender/sex discrimination and retaliation.[19]  Specifically, plaintiffs assert that he (1) suspended and terminated their employment on account of gender/sex; (2) discriminated against them on the basis of gender/sex by creating a hostile work environment; and (3) suspended and terminated their employment in retaliation for complaints of discrimination.  Defendant seeks summary judgment on all claims.  Specifically, defendant asserts that (1) plaintiffs were members of his personal staff and therefore did not constitute "employees" under Title VII; and (2) even if plaintiffs were "employees," they cannot prevail on the merits.

### A.    Whether Plaintiffs Constituted "Employees" Under Title VII

Defendant asserts that plaintiffs cannot assert claims under Title VII because they were members of his personal staff and therefore did not constitute "employees" under the statute.  To prevail on their claims, plaintiffs must show that they were "employees" within the meaning of the statute.  See, e.g., Owens v. Rush, 654 F.2d 1370, 1374 (10th Cir. 1981).  Under Title VII, the definition of "employee" excludes any person who is chosen by an elected officer to serve on his

---

[19]    In the pretrial order, plaintiffs also assert claims for associational race discrimination. See Pretrial Order (Doc. #80) at 8.  In response to defendant's motion for summary judgment, plaintiffs abandon these claims.  See Plaintiff's Response (Doc. #88) at 97 n.12.  Accordingly, the Court enters summary judgment in favor of defendant on the associational race discrimination claims.

As noted, plaintiffs previously agreed to dismiss all Title VII claims against defendant in his individual capacity.  See Plaintiffs' Response To Order To Show Cause (Doc. #28).

or her personal staff.  <u>See</u> 42 U.S.C. § 2000e(f).[20]  The statute does not define the term "personal staff."  <u>Owens</u>, 654 F.2d at 1375.  The Tenth Circuit has determined that Congress intended courts to construe the personal staff exception narrowly; its purpose is to exempt from coverage those who are chosen by the elected official and who are in a close personal relationship with him, <u>i.e.</u> his first-line advisors.  <u>See</u> <u>Owens</u>, 654 F.2d at 1375 (quoting 118 Cong. Rec. 4492-93 (1972)).  In other words, Congress intended the exception to apply "only to those individuals who are in highly intimate and sensitive positions of responsibility on the staff of the elected official."  <u>Owens</u>, 654 F.2d at 1375.

Defendant asserts that as a matter of law, plaintiffs were members of his personal staff.  <u>See</u> <u>Defendant's Memorandum</u> (Doc. #84) at 30-34.  In determining whether the personal staff exception applies, the Court considers the following non-exhaustive list of factors:

> (1) whether the elected official has plenary powers of appointment and removal, (2) whether the person in the position at issue is personally accountable to only that elected official, (3) whether the person in the position at issue represents the elected official in the eyes of the public, (4) whether the elected official exercises a considerable amount of control over the position, (5) the level of the position within the organization's chain of command, and (6) the actual intimacy of the working relationship between the elected official and the person filling the position.

---

[20]     Title VII defines "employee" as follows:

The term "employee" means an individual employed by an employer, except that the term "employee" shall not include any person elected to public office in any State or political subdivision of any State by the qualified voters thereof, *or any person chosen by such officer to be on such officer's personal staff*, or an appointee on the policy making level or an immediate adviser with respect to the exercise of the constitutional or legal powers of the office.  The exemption set forth in the preceding sentence shall not include employees subject to the civil service laws of a State government, governmental agency or political subdivision.  * * *

42 U.S.C. § 2000e(f) (emphasis added).

Nichols v. Hurley, 921 F.2d 1101, 1110 (10th Cir. 1990) (quoting Teneyuca v. Bexar Cty., 767 F.2d 148, 151 (5th Cir. 1985)).[21]

The first factor asks whether the elected official has plenary powers of appointment and removal. Defendant asserts that under Kansas law, he had plenary power to appoint and remove plaintiffs. See id. at 30-32. This may be true, but it appears that he had such power with respect to every member of his 70-person staff. As noted, the Tenth Circuit has instructed courts to construe the personal staff exception narrowly to exempt only those individuals who are in highly intimate and sensitive positions of responsibility. See Owens, 654 F.2d at 1375. Accordingly, this factor does not weigh heavily in favor of applying the exception to plaintiffs.

The second factor asks whether the person in the position at issue is personally accountable to only that elected official. Defendant asserts that plaintiffs were personally accountable to him. See id. at 32. The record suggests that several supervisors (Whitton, Loomis, McGowan and Spradling) fell in the chain of command between defendant and plaintiffs. Thus, it appears that plaintiffs were not personally accountable only to defendant. Accordingly, the second factor weighs against finding that the personal staff exception applies. Cf. Nichols, 921 F.2d at 1112 (undersheriffs directly accountable to sheriff rather than one or more intermediate supervisors).

The third factor looks to whether the person in the position at issue represents the elected

---

[21]     In Nichols, deputy sheriffs and undersheriffs sued the sheriff and county commissioners for wage claims under the FLSA, which contains a personal staff exception that is nearly identical to the exemption in Title VII. 921 F.2d at 1103. The district court granted summary judgment in favor of defendants, finding that plaintiffs were members of the sheriff's personal staff. The Tenth Circuit affirmed, finding that the deputy sheriffs and undersheriffs had the same duties and powers as the sheriff, essentially represented the sheriff in the eyes of public, and were directly accountable to the sheriff rather than to one or more intermediate supervisors. See id. at 1110-1112. In reaching its conclusion, the Tenth Circuit looked to legislative history and case law regarding the personal staff exception under Title VII. See id. at 1103.

official in the eyes of the public.  Defendant asserts that aside from himself, plaintiffs had the most contact with the public and therefore constituted the "face" of the DA office.  See Defendant's Memorandum (Doc. #84) at 33-34.  Defendant cites no authority which suggests that mere fact of public contact is sufficient to satisfy this factor.  Unlike Nichols, plaintiffs did not have the same powers and duties as defendant.  See, e.g., Nichols, 921 F.2d at 1110.  On this record, the third factor weighs against finding that the personal staff exception applies as a matter of law.

The fourth factor asks whether the elected official exercises a considerable amount of control over the position.  Defendant asserts that he had absolute control over every position in his office. See Defendant's Memorandum (Doc. #84) at 33.  Taken to its logical extreme, defendant's argument would apply to every member of his 70-person staff.  As discussed, the Court construes the personal staff exception narrowly to exempt only those individuals who are in highly intimate and sensitive positions of responsibility.  See Owens, 654 F.2d at 1375.  Moreover, the fact that defendant had absolute control over plaintiffs' positions does not show that he exercised a considerable amount of control over their positions.  To the contrary, the record suggests that he exercised very little control over their positions and had minimal day-to-day contact with plaintiffs.  On this record, the fourth factor weighs against finding that the personal staff exception applies as a matter of law.

The fifth factor looks to the level of plaintiffs' position within the organization's chain of command.  Defendant asserts that plaintiffs answered directly to him.  See Defendant's Memorandum (Doc. #84) at 33-34.  The record suggests otherwise: several supervisors fell in the interim chain of command and defendant had very little day-to-day contact with plaintiffs.  On this record, the fifth factor weighs against finding that the personal staff exception applies as a matter of law.

-21-

The sixth factor involves the actual intimacy of the working relationship between the elected official and the person filling the position. Defendant asserts that plaintiffs were "the most direct and immediate conduit between the [DA] and his constituents [and represented the DA] in court with victims and witnesses and in the community." Id. at 34. Construed in the light most favorable to plaintiffs, the record suggests that plaintiffs had very little contact with defendant and did not have an intimate working relationship with him. This factor weighs against finding that the personal staff exception applies as a matter of law.

On this record, defendant has not shown that as a matter of law, the personal staff exception applies to plaintiffs. Accordingly, defendant is not entitled to summary judgment on this ground.

### B.   Merits Of Title VII Claims

Against defendant in his official capacity, plaintiffs assert Title VII claims for gender/sex discrimination, hostile work environment and retaliation. Defendant asserts that as a matter of law, plaintiffs cannot prevail on any of their claims.

#### 1.   Gender/Sex Discrimination

Plaintiffs assert that defendant suspended and terminated their employment on account of gender/sex in violation of Title VII. Defendant asserts that plaintiffs cannot show a prima facie case of discrimination or that his legitimate reasons for terminating their employment are pretextual.

Under Title VII, an employer may not "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to [her gender/sex]." 42 U.S.C. § 2000e-2. Plaintiffs bear the ultimate burden of proving that defendant intentionally discriminated against them. See Riser v. QEP Energy, 776 F.3d 1191, 1199 (10th Cir. 2015); Adamson v. Multi

Cmty. Diversified Servs., Inc., 514 F.3d 1136, 1145 (10th Cir. 2008).   Plaintiffs can prove intentional discrimination through either direct evidence or circumstantial evidence that creates an inference of intentional discrimination.   See Riser, 776 F.3d at 1199.   Here, plaintiffs rely on both direct and indirect methods of proof.   See Plaintiff's Response (Doc. #88) at 97-102.   Defendant asserts that they cannot prevail under either theory.

When plaintiffs offer direct evidence of discrimination, their claim may move forward outside the burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 824 (1973).   See Tabor v. Hilti, Inc., 703 F.3d 1206, 1216 (10th Cir. 2013).   Comments in the workplace that reflect personal bias do not in themselves constitute direct evidence of discrimination.   Id. at 1216 (citing Ramsey v. City & Cty. of Denver, 907 F.2d 1004, 1007-08 (10th Cir. 1990)).   Rather, plaintiffs must show that the speaker had decision-making authority and acted on his discriminatory beliefs.   See id.   To qualify as direct evidence of discrimination, the context or timing of a statement must be closely linked to the adverse action.   Id at 1216 (citing Riggs v. AirTran Airways, Inc., 497 F.3d 1108, 1118 (10th Cir. 2007)).   Moreover, if one can plausibly interpret the content and context of a statement in two different ways – one discriminatory and the other benign – the statement does not qualify as direct evidence of discrimination.   Id.

Here, plaintiffs point to statements by defendant on July 14 – within 24 hours after he suspended their employment and 19 days before he fired them.   Specifically, plaintiffs point to evidence which shows that in the context of talking about them, defendant told Loomis that there was a bunch of "petty bullshit" between staff in the victim/witness unit and that these were "stupid women" fighting over "stupid shit."   Defendant said that if he fired all the women, these problems would stop.   Moreover, he said that hiring women in general was problematic and that if he did not

have to hire women he would not do so.  Construed in the light most favorable to plaintiffs, these comments constitute direct evidence of discrimination.  In particular, defendant – the decision maker – made the comments in a context which suggests direct nexus and close temporal proximity to adverse decisions regarding plaintiffs' employment.  Under the circumstances, a reasonable jury could link the content of his discriminatory statements directly to his decisions to suspend and terminate plaintiffs' employment. See Tabor, 703 F.3d at 1217.  On this record, defendant has not shown that he is entitled to summary judgment on plaintiffs' claims for gender/sex discrimination.

### 2.      Hostile Work Environment

Plaintiffs assert that defendant discriminated against them on the basis of sex by creating a hostile work environment.  Defendant seeks summary judgment on this claim.  In support of the motion, defendant cites legal standards for hostile work environment claims and asserts that "[t]here is no evidence that either plaintiff was subjected to harassment on the basis of their gender/sex." Defendant's Memorandum (Doc. #84) at 42.  Defendant provides no legal or factual analysis to support his argument.  The Court therefore does not consider it here. See, e.g., Boxum-Debolt v. Office of Dist. Attorney, No. 12-2641-KHV, 2013 WL 5466915, at *4 n.5 (D. Kan. Sept. 30, 2013) (citing Rader v. U.S.D. 259 Wichita Pub. Sch., 844 F. Supp.2d 1206, 1211-12 (D. Kan. 2011)) (court will not construct arguments on behalf of defendant).  On this record, defendant has not shown that he is entitled to summary judgment on plaintiffs' claims for discrimination based on hostile work environment.

### 3.      Retaliation

In the pretrial order, plaintiffs assert that defendant retaliated against them because they complained that (1) defendant discriminated against female employees by failing to provide an

appropriate location to breastfeed; and (2) Whitton engaged in race discrimination.  See Pretrial Order (Doc. #80) filed February 9, 2016 at 5.  Defendant seeks summary judgment on both claims. See Defendant's Memorandum (Doc. #84) at 45-57.

Title VII forbids retaliation against an employee because she has "opposed" any practice made unlawful by Title VII, or because she has "participated" in an investigation, proceeding, or hearing regarding a claim of discrimination.  Stover v. Martinez, 382 F.3d 1064, 1070 (10th Cir. 2004) (quoting 42 U.S.C. § 2000e–3(a)).  Because plaintiffs seek to prove their claims through indirect evidence, the burden-shifting analysis of McDonnell Douglas applies.  See Lujan v. Walters, 813 F.2d 1051, 1058 (10th Cir. 1987).  To establish a prima facie case of retaliation, plaintiffs must show (1) that they engaged in protected opposition to discrimination or participated in an investigation regarding a claim of discrimination, (2) an employment action which a reasonable employee would have found materially adverse, and (3) a causal connection between the protected activity and the materially adverse action.  See Tabor, 703 F.3d at 1219 (citing Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1202 (10th Cir. 2006)).  If plaintiffs establish a prima facie case, the burden of production shifts to defendant. If defendant offers a legitimate, nondiscriminatory reason for the action, the burden shifts back to plaintiffs to demonstrate that the proffered explanation is pretextual.

With respect to plaintiffs' claims that defendant suspended and terminated their employment because they complained that Whitton engaged in race discrimination, defendant concedes that for purposes of summary judgment, plaintiffs can establish a prima facie case.  See Defendant's Memorandum (Doc. #84) at 47.  With respect to the claims that defendant retaliated because they complained that he failed to provide an appropriate location for female employees to breastfeed,

defendant contends that plaintiffs cannot establish the third element of a prima facie case, i.e. a causal connection between the protected activity and the materially adverse action. Where adverse action is very closely connected in time to protected activity, temporal proximity alone is sufficient to show causation. See Meiners v. Univ. of Kan., 359 F.3d 1222, 1231 (10th Cir. 2004). Otherwise, plaintiffs must rely on additional evidence to establish causation. Id. To determine whether plaintiffs can show a causal connection, the Court may examine all evidence of a retaliatory motive, including evidence of pretext which is typically considered in a later phase of the McDonnell Douglas analysis. See Proctor v. UPS, 502 F.3d 1200, 1209 (10th Cir. 2007); Wells v. Colo. Dep't of Transp., 325 F.3d 1205, 1218 (10th Cir. 2003).

Here, plaintiffs assert that the temporal proximity between the time of their complaint in early June of 2010 and the time of their suspensions in mid-July of 2010 supports a finding of causal connection. The Tenth Circuit has found that a six-week period between protected activity and adverse action may be sufficient in itself to establish causation, but a three-month period, standing alone is insufficient. See Meiners, 359 F.3d at 1231. Construed in a light most favorable to plaintiffs, the record suggests that only six weeks elapsed between the time of their complaint to Loomis and the time when defendant suspended their employment. Defendant asserts that he did not know that plaintiffs had complained to Loomis. See Defendant's Memorandum (Doc. #84) at 47. Construed in a light most favorable to plaintiffs, however, the record supports a reasonable inference that Loomis gave defendant this information. On this record, defendant has not shown that as a matter of law, plaintiffs cannot establish a causal connection.

Because plaintiffs can establish a prima facie case of retaliation, the burden of production shifts to defendant to articulate a legitimate, nondiscriminatory reason for his actions. Defendant

asserts that he fired plaintiffs because (1) Murphy told him that they were plotting to get Whitton fired; (2) he learned that they had derogatory and unprofessional comments about co-workers on the county email system; and (3) they were perpetuating a hostile work environment.   See Defendant's Memorandum (Doc. #84) at 3 ¶ 1.[22]  Because defendant has articulated legitimate reasons for terminating plaintiffs' employment, the burden shifts back to plaintiffs to show that his reasons are a pretext for retaliation.   Plaintiffs may do so by producing evidence of "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons."   Jones v. Okla. City Pub. Sch., 617 F.3d 1273, 1280 (10th Cir. 2010) (further citations omitted).

As to the first reason, defendant asserts that he discharged plaintiffs because Murphy told him that they were plotting to get Whitton fired.  Plaintiffs claim that a jury could find pretext based on the timing of Murphy's statement.  See Plaintiffs' Response (Doc. #88) at 104.  The Court agrees.

_____

[22]   As a preliminary matter, the Court notes that defendant has not articulated reasons for suspending plaintiffs' employment. Accordingly, defendant is not entitled to summary judgment on plaintiffs' claims for retaliatory suspension of their employment.

Plaintiffs assert that defendant has not articulated legitimate nondiscriminatory reasons for terminating their employment. See Plaintiffs' Response (Doc. #88) at 102-03. In the argument section of his memorandum in support of summary judgment, defendant does not identify the reasons for his actions; rather, he asserts merely that he has advanced "legitimate and non-discriminatory reasons" for terminating their employment and plaintiffs cannot show that the reasons are pretextual. Defendant's Memorandum (Doc. #84) at 39, 47. In his first statement of fact, defendant specifies three reasons for the termination decision. See id. at 3. The Court agrees that defendant should have more clearly articulated and discussed his reasons in the argument section of his brief. On this record, however, defendant has sufficiently articulated his reasons for purposes of his summary judgment motion. See id. at 3. Indeed, plaintiffs' response addresses the reasons articulated by defendant. See Plaintiffs' Response (Doc. #88) at 103-08.

Defendant did not talk to Murphy until after he had suspended plaintiffs' employment.  As noted, defendant provides no reason for his decision to suspend their employment.  On this record, where defendant has articulated no reason for suspending plaintiffs' employment and bases his reason for termination on information that he received after the suspension, a reasonable jury could conclude that the articulated reason is a pretext for retaliation.  Moreover, construed in a light most favorable to plaintiffs, the record supports an inference that during his investigation, defendant determined that Whitton had engaged in inappropriate conduct but did not reprimand or discipline her.  Construed in the light most favorable to plaintiffs, this evidence casts doubt on defendant's stated reason for the termination.

For the second reason, defendant asserts that he fired plaintiffs because he learned that they had made derogatory and unprofessional comments about co-workers on the county email system.  Plaintiffs assert that the explanation is pretextual because defendant (1) himself used rude phrases in the workplace; (2) had no evidence that plaintiffs authored the emails; and (3) did not give them a chance to refute the emails.  See Plaintiffs' Response (Doc. #88) at 105-07.  Construed in a light most favorable to plaintiffs, the record casts doubt on defendant's stated reason for termination.  Defendant repeatedly denied plaintiffs' requests to see or explain the emails even though they told him that (1) the emails may have been taken out of context; and (2) if the emails came from Whitton, she may have altered them because she had been known to do that.  Defendant did not check whether Whitton had pulled favorable emails, and he did not look at emails of any other employees to determine whether plaintiffs' emails were similar to or different from those of other employees in the unit.  Also, defendant did not look into the environment of the victim/witness unit to see if other employees were making derogatory or unprofessional comments about fellow workers.  From

2009 to 2015, plaintiffs were the only employees who defendant singled out and fired for these types of emails and before their termination, plaintiffs had never been written up for any kind of disciplinary, performance or behavior issues.  Moreover, as discussed, defendant determined that Whitton had engaged in inappropriate conduct but did not reprimand or discipline her.  Construed in the light most favorable to plaintiffs, this evidence creates a genuine issue of material fact about the truth of defendant's stated reason for termination.

As to the third reason, defendant asserts that he discharged plaintiffs because they were perpetuating a hostile work environment.  Plaintiffs assert that defendant has not articulated in what way he believed they were perpetuating a hostile work environment.  See Plaintiffs' Response (Doc. #88) at 107.  The Court agrees.  The record contains no information regarding how this reason is different from the first two.  For reasons stated, construed in a light most favorable to plaintiffs, the evidence creates a genuine issue of material fact whether defendant's stated reason for the termination is pretextual.  Accordingly, defendant is not entitled to summary judgment on the termination claims.

**IT IS THEREFORE ORDERED** that defendant's Motion For Summary Judgment (Doc. #83) filed February 26, 2016 be and hereby is **SUSTAINED in part**.  The Court grants summary judgment in favor of defendant on plaintiffs' claims that defendant suspended and terminated their employment because of associational race discrimination.

Against Chadwick J. Taylor in his official capacity as District Attorney for the Third Judicial District of the State of Kansas, the following claims remain in the case: that in violation of Title VII, defendant (1) suspended and terminated plaintiffs' employment on account of sex/gender; (2) engaged in sex/gender discrimination by creating a hostile work environment; and (3) suspended

and terminated plaintiffs' employment in retaliation for their complaints of discrimination.

Dated this 1st day of December, 2016 at Kansas City, Kansas.

s/ Kathryn H. Vratil
KATHRYN H. VRATIL
United States District Judge