IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| KRYSTAL L. BOXUM-DEBOLT, ET AL., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 12-CV-2641 KHV/KGG |
| OFFICE OF THE DISTRICT ATTORNEY, 3RD JUDICIAL DISTRICT OF KANSAS (SHAWNEE COUNTY DISTRICT ATTORNEY'S OFFICE), ET AL. | ) ) ) ) ) ) | |
| Defendants. | ) | |

**PLAINTIFFS' MOTION FOR NEW TRIAL AND SUPPORTING MEMORANDUM**

Plaintiffs Krystal L. Boxum-Debolt and Lisa Anne Moore hereby move pursuant to Federal Rule of Civil Procedure 59(a) for a new trial on all claims and request that the January 17, 2017 Judgment [Doc. 151] entered in favor of Defendant Mike Kagay be vacated.

Ms. Boxum and Ms. Moore do not claim they were perfect employees. But they cared deeply about their work helping victims. And they identified legitimate problems in the District Attorneys' office with illegal sex and race discrimination by their supervisor against their co-workers and against the undocumented, non-English speaking widow of a murder victim. Plaintiffs *believed it was their duty* to report these concerns, and by doing so they took huge risks very early in their careers to try to prevent mistreatment of other, more vulnerable persons. And they did this in the face of more senior employees such as Assistant District Attorney Keith Henderson warning them they likely would be fired if they reported their concerns. Yet *still they had the courage to step up* to try to stop discrimination.

Instead of being treated like heroes or heroines, they were fired, their reputations dragged through the mud, their career paths de-railed.  If plaintiffs here aren't protected by Title VII, what kind of message will be sent to similarly situated employees who are motivated to do the right thing?  The verdict for defendant in this case ignored the overwhelming evidence of sex discrimination and retaliation and can only be the product of jury nullification.  Plaintiffs ask that the verdict be set aside and a new trial ordered on all claims in this case.  In support of their motion, the plaintiffs submit the following memorandum.

## I.    STANDARD ON MOTION FOR NEW TRIAL

Motions for a new trial are committed to the sound discretion of the trial court. *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 556, 104 S. Ct. 845, 78 L. Ed. 2d 663 (1984). Federal Rule of Civil Procedure 59(a) authorizes the court to grant a new trial "in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States." The district court must grant a new trial when it deems a new trial necessary to prevent injustice. It has broad discretion in making such a determination.  *McDonough Power Equipment, Inc.,* 464 U.S. at 556.  An error of law, if prejudicial, is grounds for a new trial.  *Anderson v. Phillips Petroleum Co.,* 861 F.2d 631, 637 (10th Cir. 1988); 11 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2805 at 38 (1973). In considering a motion for a new trial, the court should "exercise judgment in preference to the automatic reversal for 'error' and ignore errors that do not affect the essential fairness of the trial." *McDonough Power Equipment, Inc.,* 464 U.S. at 553.  "The party seeking to set aside a jury verdict must demonstrate trial error which constitutes prejudicial error or that the verdict is not based on substantial evidence." *White v.*

*Conoco, Inc*., 710 F.2d 1442, 1443 (10th Cir. 1983); *Rios v. Welch*, 856 F. Supp. 1499, 1501 (D. Kan. 1994).

The standard for granting a new trial is less rigorous than the standard for granting judgment notwithstanding the verdict. A decision to grant a new trial "involves an element of discretion which goes further than the mere sufficiency of the evidence. It embraces all the reasons which inhere in the integrity of the jury system itself." *Tidewater Oil Co. v. Waller*, 302 F.2d 638, 643 (10th Cir. 1962). A motion for new trial "should be granted when the court believes the verdict is against the weight of the evidence, prejudicial error has occurred, or substantial justice has not been done." *Miller v. Prairie Ctr. Muffler, Inc.*, 2005 U.S. Dist. LEXIS 4058, *2, 2005 WL 679088 (D. Kan. Feb. 22, 2005)(Granting motion for new trial to plaintiff where position asserted by defendant was "contrary to any common sense understanding" and was "overwhelmingly against the weight of the evidence."). "[W]hen a verdict is against the weight of the evidence, the court has a duty to grant a new trial in order to prevent a miscarriage of justice." *See Duncan v. Duncan*, 377 F.2d 49, 52 (6th Cir.), cert. denied, 389 U.S. 913, 88 S. Ct. 239, 19 L. Ed. 2d 260 (1967); *Lewis v. Bd. of Sedgwick County Comm'rs*, 140 F. Supp. 2d 1125, 1139, 2001 U.S. Dist. LEXIS 5748, *38 (D. Kan. 2001).

The verdict for defendant on plaintiffs' Title VII sex discrimination and retaliation claims was overwhelmingly against the weight of the evidence and contrary to "any common sense understanding" of the facts presented at trial. In addition to the overwhelming weight of the evidence showing plaintiffs were subjected to sex discrimination and retaliation for their protected complaints of discrimination against their co-workers, errors in the admission of evidence concerning the "personal staff" exemption and plaintiff Moore's sexual orientation

were sufficiently prejudicial so as to justify a new trial. The court should exercise its sound

discretion and grant plaintiffs a new trial on all claims in this case.

## II.   THE OVERWHELMING WEIGHT OF THE EVIDENCE PROVED SEX AND RETALIATION WERE MOTIVATING AND DETERMINING FACTORS IN THE TERMINATION OF PLAINTIFFS BY DEFENDANT.

### a.  Overwhelming Direct Evidence

The jury heard overwhelming direct evidence that sexual bias against women was a

motivating factor for former District Attorney Chad Taylor in his decision to fire plaintiffs.

The evidence included the following:

- DA Taylor described women as "*rug munchers, dykes, lesbians, bitches, sluts, whores, and strippers.*"

- Taylor stated that women are "*crazy, irrational, and stupid.*"

- Taylor stated that "*women treat work like a fashion show*."

- Taylor stated that to be successful as a female at work you can't be like most women, instead *"you need to be able to turn the bitch on and turn the bitch off."*

- Taylor angrily stated that Christine Ladner was a "*fat bitch"* when he falsely blamed her for the poor work performance of a male colleague.

- Taylor stated that plaintiffs Boxum and Moore are "*meddling women who just can't get along."*

- Taylor stated that he would prefer to "*fire all the women.*"

- Taylor referred to Plaintiffs specifically using highly derogatory sexual slurs, including calling them *"cunts," "bitches," "fat bitches," "fucking cunts,"* and "*dykes."*

As the jury heard, these derogatory, sexist and hostile statements towards plaintiffs and

other women were typical of the environment created and condoned by then District Attorney

4

Chad Taylor in which Plaintiffs worked from January 2009 when Taylor took office, until August 2, 2010, when he fired them.

In late May 2010, a coworker of Plaintiffs, Dee Wallace, approached them asking if there was any obligation for the DA to provide a private room where she could breast-pump as a nursing mother. Plaintiffs researched the issue and then approached Defendant Taylor's Deputy Chief of Staff (Mr. Loomis) and told him about their concern and informed him of the legal requirement to provide a private room for nursing mothers.  Mr. Loomis then went to Defendant Taylor and reported Plaintiffs' concerns.

Defendant Taylor became irate. He told Mr. Loomis that he didn't need to deal with "*these crazy women* who are asking or demanding things that he doesn't need to take care of," and he indicated he thought it was just a "*crazy, bullshit issue.*" Mr. Taylor's response should have been expected given his propensity to use insulting and intensely degrading language and sexual epithets to describe women.  As Mickie Brassel testified, she was fired by DA Taylor almost immediately after she complained that she was being paid less than her male peers due to sex discrimination.  Similarly, Melissa Dunkley testified that Taylor often stated that he thought women treated work "like a fashion show" and he referred to Dee Wallace's need to pump breast milk as "disgusting."  Shortly after reporting their concerns, Plaintiffs were suspended and then terminated based on pretextual accusations as discussed below.

It is well settled that a decision maker's actions or remarks that could be viewed as reflecting discriminatory animus are relevant to a Title VII discrimination claim, as such remarks give rise to an inference of discrimination or discriminatory or retaliatory intent, animus, and/or motive. *See Plotke v. White*, 405 F.3d 1092, 1101 (10th Cir. 2005).  Discriminatory or retaliatory

comments or actions made by a decision maker, even if made after the alleged adverse action, are admissible and highly relevant to demonstrating a decision maker's discriminatory or retaliatory intent or motive at the time of taking the adverse action.

The evidence at trial established overwhelming direct evidence of Taylor's bias against women in general and Plaintiffs as women in particular.  For example the jury heard the evidence as follows:

- When Taylor disagreed with decisions made by females he would make comments that they were "irrational, crazy" and stated "this is how women behave."

- Taylor referred to the women in the Victim/Witness Unit where Plaintiffs worked, as "stupid."

- Taylor stated that "hiring women in general was a problem and if Taylor didn't have to hire women he wouldn't."

- When referring to women, Taylor commonly used "derogatory terms . . . anything along the lines of rug muncher, dyke, bull-dyke, lesbian, . . . bitch."

- Taylor often referred to members of women's rights organizations as "dykes and lesbians and bitches."

- Taylor used derogatory terms regarding gay sexual orientation in reference to women generally, whether gay or straight.

- Ms. Moore testified to her presence in meetings during which Taylor would call someone a bitch and he called the women from the YWCA "feminazis."

- Ms. Moore was also present at times when Mr. Taylor was present and did not correct DA office employees who referred to women looking like sluts, whores, or strippers. On one occasion Taylor made a reference to a woman's "tits hanging out."

- Taylor referred to women "in derogatory terms. . .   As crazy, irrational human beings, and that came from Mr. Taylor directly."

- Lee McGowan, Defendant's Chief of Staff, has heard DA Taylor make derogatory remarks about women including sexist-type terms.

- Mr. Patterson (Defendant's senior deputy district attorney and employment law advisor who assisted in the sham "investigation" that led up to Plaintiffs' termination) used the same derogatory terms as Taylor to refer to women and also made derogatory references about sexual acts between employees at the DA's Office and participated in email threads with derogatory depictions of women as sexual objects.

- Taylor and his advisor's use of terms that were intensely degrading to women was "a constant refrain."

- Taylor's preference would be to "fire all the women."

- Taylor stated that if you fire all the women, "these problems would stop."

Moreover, evidence of Taylor's sex biased intent obtained after the fact was presented to the jury and is even more powerful here than the contemporaneous admissions. "In fact, an *after-the-fact admission might be considered particularly powerful evidence by a fact-finder*, because a person who behaves this way has a strong motivation to hide her motivations after the damage is done." *Pulsipher v. Clark Cty.*, No. 2:08-cv-01374-RCJ-LRL, 2010 U.S. Dist. LEXIS 139057, at *30-31 (D. Nev. Dec. 27, 2010) (emphasis added). Such evidence of intent is also directly relevant to demonstrate "pretext" regarding the adverse action. *Ryder v. Westinghouse Elec. Corp.*, 128 F.3d 128, 130-34 (3d Cir. 1997).

As the United States District Court for the District of Nevada explained in finding such after-the-fact comments (made two or three years after the adverse action)[1] critical to demonstrate discriminatory intent: "Before-the-fact and after-the-fact comments will often be the 'smoking gun' of discriminatory treatment." *Pulsipher*, 2010 U.S. Dist. LEXIS 139057, at *23-24. *Id.* at *14. Clearly, such after-the-fact comments made by DA Taylor regarding his

---

[1] "There is evidence [the decision maker] made comments indicating her motives and intent to treat persons of Plaintiffs' protected classes differently." *Pulsipher v. Clark Cty.*, No. 2:08-cv-01374-RCJ-LRL, 2010 U.S. Dist. LEXIS 139057, at *30 (D. Nev. Dec. 27, 2010)

animus toward women and the Plaintiffs were highly relevant here, and no reasonable jury could have ignored them.

In his conversations with Jason Perkey after he fired plaintiffs, DA Taylor referred to Plaintiffs using highly derogatory sexual slurs, including calling them "cunts," "bitches," "fucking bitches," "fat bitches," "fucking cunts," and "dykes."  These types of sexual epithets are intensely degrading to women and presented overwhelming evidence of Taylor's sexual animus towards the plaintiffs. *See Winsor v. Hinckley Dodge, Inc.*, 79 F.3d 996, 1000 (10th Cir. 1996) (quoting *Jenson v. Eveleth Taconite Co.*, 824 F. Supp. 847, 883 (D. Minn. 1993)); *see also E.E.O.C. v. Pvnf, L.L.C.*, 487 F.3d 790, 799 (10th Cir. 2007) (the word "bitch," is a "sexual epithet" that is intensely degrading"); *O'Shea v. Yellow Tech. Serv.*, 185 F.3d 1093 (10th Cir. 1999); *Pelletier v. Town of Somerset*, 939 N.E.2d 717, 727 n.24 (Mass. 2010) (the phrases "carpet muncher" and "diesel dyke" were "offensive treatment.").  The testimony about DA Taylor making such statements regarding the Plaintiffs, *by a third party witness who Defendant did not even try to impeach*, provided overwhelming evidence of sex bias that no reasonable jury could have ignored. The comments made by DA Taylor were specifically directed toward the plaintiffs in this case and demonstrate beyond any doubt that sexually discriminatory bias was a motivating factor in his decisions to terminate the plaintiffs.

On July 13, 2010, Defendant Taylor placed Ms. Moore on leave.  He placed Ms. Boxum on leave on July 14, 2010, and on August 2, 2010, he terminated the employment of both plaintiffs.  The frequency and context of Taylor's vulgar, directly gender-biased comments, the temporal proximity of these comments to Taylor's suspension and termination of plaintiffs' employment, his specific, declared preference to "fire all the women," and other comments and

actions which reflect his direct bias against women and especially women who raised complaints of discrimination, when combined with his admitted decision-making authority and his execution of that authority to suspend and terminate Plaintiffs and his unmistakable, horrifically sexually biased statements about plaintiffs after he fired them, provided the jury with overwhelming direct evidence that Taylor, in fact, was motivated by sexually discriminatory animus. The verdict for defendant on plaintiffs' claims of discriminatory and retaliatory termination in the face of such overwhelming direct evidence can only have been the result of jury nullification and should be set aside and a new trial granted.

### b.   Overwhelming Evidence Showing Stated Reasons For Firing Were False

DA Taylor claimed two reasons for deciding to fire plaintiffs: (1) former victim/witness specialist Sue Murphy allegedly reported to Taylor that Plaintiffs were "plotting" to get their supervisor fired—the supposed "coup d'état"; (2) Taylor claimed he learned that both plaintiffs had made derogatory and unprofessional comments about co-workers using the county's email system.   Plaintiffs presented overwhelming evidence that Taylor's claimed reliance on these alleged reasons was false.[2]

### i.   Sue Murphy describing Plaintiffs' alleged plot or "coup.".

Plaintiffs presented overwhelming evidence that this supposed reason for their termination was false as follows:

---

[2] "The fact finder is entitled to infer from **any** 'weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions' in the employer's proffered reasons for its action that the employer did not act pursuant to those reasons." *Miller v. Eby Realty Group LLC*, 396 F.3d 1105, 1112 (10th Cir. 2005) (quoting *Morgan*, 108 F.3d at 1323) (emphasis added). Plaintiffs' burden of showing pretext is not onerous. *Id.* at 1323-24; *see also Richards v. Eldorado Nat'l Co.*, 2004 U.S. Dist. LEXIS 21205, at *25-26 (D. Kan. 2004). A plaintiff may offer different types of proof of pretext and is not tied to a single form of evidence. *See Whittington v. Nordam Group Inc.*, 429 F.3d 986, 994 (10th Cir. 2005) (noting various types of evidence bearing on pretext); *Plotke*, 405 F.3d at 1101. The court should review that evidence collectively. *See Miller*, 396 F.3d at 1112.

- First, recall Sue Murphy's testimony about her "declaration" statements about the coup that were written for her by defendant's lawyers—as she admitted very openly—the word "coup" "doesn't sound like something I would say."

- Also recall the substance of her testimony—Ms. Murphy testified she had the same concerns about discrimination against Mary Morales as Ms. Boxum and Ms. Moore, and she was concerned that Heather Whitton was retaliating against Ms. Morales.

- Further, Ms. Murphy testified at trial that she recalled having worked on writing an email to Mr. Taylor describing her concerns about Whitton's treatment of Morales. Yet somehow this escaped mention in her declaration.

- The jury learned that Ms. Murphy had not been employed for nearly two months before the events leading to plaintiffs' termination, so the claim that she could have any knowledge of a supposedly planned "coup" was simply incredible.

- The jury further heard the evidence that there was nothing in any Taylor notes from the "investigation" showing anything about this supposed "coup" and Matt Patterson further testified he didn't even know where that idea came from!

- Indeed, Taylor's own notes of the Murphy interview reveal further support for what he admitted was a "common theme" in his investigation—that Ms. Murphy (like other employees) reported that *Ms. Whitton* in fact was bullying and intimidating and that her staff were afraid to speak out about her because "Heather would retaliate against you . . . if you upset her."

- If indeed there was a plot involving Boxum, Moore and Loomis to perform a coup, then why wasn't Loomis fired or disciplined?  Assuming there had been such a plot, then the disparate treatment of plaintiffs and Loomis would be further powerful evidence of gender bias, but all evidence showed the supposed coup was simply a fabricated excuse by Taylor to justify his illegal decisions after the fact.

- Moreover, nothing in any of the emails seized from the plaintiffs' accounts revealed any plan for a "coup" and in fact they showed just the opposite— plaintiffs were terrified about reporting their concerns and only did so out of a belief that it was their duty to do so in order to help victims of Heather Whitton's discriminatory actions!

- All witnesses involved testified that Boxum and Moore were terrified to raise this issue—Loomis, Henderson, Morales, Boxum, even Ms. Spradling admitted Ms. Boxum was very afraid.

- Finally, the jury heard the compelling, impartial testimony of former Assistant DA,

Keith Henderson:   Q: Why didn't you report these legitimate concerns about Heather Whitton's discrimination after Ms. Boxum reported them to you? A: "I didn't want to get fired!"

In short, the alleged "coup" was clearly a fabricated excuse as the overwhelming evidence at trial demonstrated.

### ii.   The alleged derogatory email comments about co-workers.

While it is undisputed that plaintiffs used some colorful language in a few emails several months prior to their firings, Taylor's claim that emails were the reason he terminated plaintiffs' employment was simply not believable by any reasonable jury. Taylor could not state with any modicum of credibility that he found the emails, to be more offensive than his own frequent and indiscriminate use of terms such as rug muncher, dyke, bull-dyke, lesbian, cunt, and bitch to refer to plaintiffs and other women; more offensive than referring to the women in the unit where Plaintiffs worked as "stupid"; or more offensive than referring to women as "crazy, irrational human beings."

And again, as with the alleged "coup," Taylor's conduct in 2010 belies his contention now that any emails with unprofessional comments about co-workers were in fact why he fired plaintiffs. If Defendant were truly concerned about any of the emails, he would have investigated the circumstances surrounding the emails instead of simply putting them in a secret file and not providing any opportunity for Plaintiffs to be questioned about, explain, or respond to the emails. This is particularly true where Defendant was well aware that there was the possibility of emails being altered by plaintiffs' supervisor, Whitton, and where he was presented substantial evidence that Whitton had a common pattern of retaliating against employees who crossed her. To neither ask Plaintiffs about any of the alleged emails provided by Whitton, nor put them on notice that

they were under investigation for their alleged misconduct shows that defendant's post-termination claim of improper emails is entirely pretextual. Given all of this evidence and the evidence that Taylor himself regularly condoned and used derogatory language far worse than anything contained in the alleged emails, any reasonable jury would conclude that defendant's reliance on the emails as support for the termination of plaintiffs was pretextual.

Consider the additional evidence presented to the jury about the emails:

- All the emails were gathered by Ms. Whitton after she undoubtedly knew (either from Ms. Spradling or from reviewing the Blackberry PIN messages) that she was the subject of a complaint of discrimination by plaintiffs;

- Whitton was involved in the email exchanges with plaintiffs about the co-worker discussed in the emails in derogatory terms, and she knew plaintiffs had good reason to be upset with that co-worker who had circulated derogatory emails about plaintiffs herself;

- Vulgar language was commonplace at the DA's office both verbally and in emails—the jury heard that from Mr. Taylor on the stand during trial, and from every other witness who testified—coarse language, gallows humor, making fun of people—all of this was common, day to day stuff at the DA's office;

- There was no legitimate threat of an open records discovery of co-worker emails—it never happened and Taylor and Patterson admitted there are all kinds of exceptions for a prosecutor's office;

- The defendant never searched or audited any other employee emails to see if this type of language was occurring until Plaintiffs asked them to conduct a search 5 years later in this suit—of course the claim that they only found one example (involving Matt Patterson) 5 years after the fact is not evidence that other such emails did not exist at the time as various witnesses testified;

- Nothing in the DA's email policy says an employee will be fired for technical violations with no warning—the policy only talks about losing internet privileges as a penalty for violations;

- And most importantly, Taylor described the conduct of Plaintiffs as "picking at each other" which was common in the office, and Matt Patterson testified the email conduct by plaintiffs was at most "bickering" that in no way compared to the horrible conduct of Ms. Whitton.

12

- Yet, in stark contrast with the treatment of Plaintiffs, Ms. Whitton was not fired, demoted, transferred, terminated, forced to resign or take a pay cut, and indeed she worked at the DA's office another 8-9 months after these events.

### iii.   Fabricated Chronology of Events of July 12-14 2010

Plaintiff Boxum spoke with Jaquie Spradling late in the day on July 12, 2010, and expressed her concerns that Ms. Whitton was acting in a racially discriminatory manner and told Ms. Spradling that Plaintiff Moore would also like to speak with her about similar concerns.  The very next day, July 13, 2010, Defendant Taylor forced Ms. Moore to take medical leave under the false pretense that she was a liability to the office because of a recent trip to the emergency room.  The following day, July 14, 2010, Mr. Taylor placed Ms. Boxum on administrative leave, ostensibly to investigate her report about Ms. Whitton's discriminatory conduct.

Taylor knew that to admit that he suspended Ms. Boxum and Ms. Moore immediately after receiving a report of discrimination would demonstrate overwhelmingly his illegal, retaliatory motive.  Therefore, he tried to construct a timeline to suggest he did not know about Ms. Boxum's report to Ms. Spradling at all until July 14th, *after* both Plaintiffs were suspended, and further claimed he did not know about Ms. Boxum's report of discrimination until he interviewed her on July 16th at the Douglas County DA office.  However, the evidence at trial showed unmistakably this was a fabricated timeline.

First, recall that Taylor claimed when he interviewed Mary Morales on July 14th—one of the key things he claims he asked her was if she believed she was being discriminated against.  Of course the reason he asked that—but did not document either the question or the answer – is because Ms. Boxum had reported it to Ms. Spradling on July 12th, and Spradling reported it immediately to him.  A further critical lie by Taylor about his fabricated timeline was his

testimony at trial concerning the date when he interviewed Heather Whitton.  As the jury heard, in his deposition he stated he did not interview Whitton until after he spoke with Sue Murphy.  This placed the supposed Whitton interview sometime later than July 20th.

By time of trial, Taylor had realized this alleged late interview date sounds really bad if he wanted to try to claim he fired Whitton for "the worst fucking poor judgment you've ever seen"— or "cutting out the cancer" as Mr. Cooper claimed at trial.  So at trial he changed his testimony on this critical fact to claim that he interviewed Whitton on July 14th!

This whole timeline also hinged on Jaquie Spradling and her claim that she did not report Boxum's complaint to Taylor until July 14th, two days after she learned about it, and not until *after* plaintiffs were suspended.  The only way that testimony makes any sense at all is if Spradling could try to minimize the importance of the report from Boxum.  A key component of this fake story was that when Spradling was deposed a year and a half before trial, she claimed that Caritina, the spouse of the murder victim, was in fact, NOT a possible witness in her husband's murder trial, so Spradling claimed she really had no concern about how Whitton was treating Caritina.

This story was surprising, but Ms. Spradling was very insistent.  But what Ms. Spradling ought to know as a trial lawyer of 30 years, is that litigation requires a lot of homework, a lot of digging, research, investigating.  And so after that deposition plaintiffs uncovered some very surprising information—in fact, not only was Caritina a witness at a murder trial, she was Ms. Spradling's witness--called to the stand by Ms. Spradling to testify under oath to identify the autopsy photos of her dead husband!  And she had been called to the stand by Ms. Spradling only

about 4 months before all these events occurred with Plaintiffs. And, indeed Caritina was still likely to be a witness in another trial related to this same murder!

And so Plaintiffs brought that trial transcript to Court and were prepared to let Mrs. Spradling correct her statements from her deposition. But on her direct testimony, Ms. Spradling doubled down—claiming not only that Caritina was NOT a witness, moreover she claimed, it would violate ethical rules to even try to call her as a witness!  But on cross examination, Ms. Spradling realized she had been caught red-handed when she saw the partial transcript from the murder trial.  "Oh" she exclaimed with surprise!  "Yes, in fact I did call her as my witness" -- only 4 months before this happened!

The DA's entire explanation for its fabricated chronology hinged on Spradling's credibility in claiming that she did not walk down the hall or pick up the phone and call Taylor immediately after she heard the information about Caritina and Morales from Ms. Boxum on July 12th.  And the only way that made any sense is if the report about Caritina wasn't a big deal.  The jury heard unmistakably that Mr. Taylor knew it was a big deal—"the worst fucking poor judgment he'd ever seen."  Remember, this involved the first homicide that occurred while Taylor was the DA.  Of course Ms. Spradling also would have known this was a huge problem when she heard a report from Ms. Boxum about the abuse of one of the witnesses she was relying on in multiple homicide trials.   Undoubtedly, Spradling reported this information immediately to Taylor, well prior to his decisions to place Moore and Boxum on suspension.

But, instead of thanking Ms. Boxum and Ms. Moore--as was his way, Taylor lashed out, and shot the messengers – just "meddling women."  There was simply overwhelming evidence that sex discrimination and retaliation were the causes of Plaintiffs terminations and the fabricated

July 12-14 chronology is a key piece of evidence no reasonable jury could ignore in reaching its verdict.

### iv.   The Sham Investigation

After he suspended both Plaintiffs, DA Taylor and Matt Patterson conducted a sham "investigation" looking for a pretextual excuse to terminate Plaintiffs' employment. During this so-called "investigation," Taylor's goal was to find information to justify his decision to fire Plaintiffs, which he claims he discovered in the form of several allegedly inappropriate emails. However, Taylor did not even ask Plaintiffs their side of the story or give them an opportunity to see or explain the secret cache of alleged "emails" he claims was the basis for firing them. A basic and important step to legitimize any investigation is for the employer to give an employee the opportunity to tell her "side of the story." *E.E.O.C. v. BCI Coca-Cola Bottling Co.*, 450 F.3d 476, 491 (10th Cir. 2006); *Kendrick v. Penske Trans. Serv., Inc.*, 220 F.3d 1220, 1231-32 (10th Cir. 2000).

Here, the jury heard overwhelming evidence that the "investigation" conducted by Taylor leading to the "evidence" he used to fire plaintiffs was a sham. Consider defendant's admissions related to the "investigation" process:

- Patterson did not document the Mary Morales interview;

- Patterson did not document the Sue Murphy interview;

- According to Patterson they did not interview the principal alleged bad actor, Heather Whitton, and regardless no documentation of anything she may have said separately to Taylor, whether on July 14th or sometime after July 20th was ever retained or produced;

- Defendant did not interview the other victim, Caritina, even though there was evidence that Whitton continued to engage her to clean her house after the report by Boxum;

16

- Defendant did not have any investigation plan;

- Defendant did not audit or review emails of any other employees besides the plaintiffs who made a protected complaint of discrimination;

- Defendant did not save the blackberry PIN messages between plaintiffs and Loomis that were identified by Whitton and showed the plaintiffs were planning to report Whitton's misconduct and *proved that the DA had this information before making any decision to suspend either plaintiff*!

- Defendant did not utilize a gender-neutral investigating team although Patterson testified that is his normal practice;

- Defendant never told Boxum and Moore they were being investigated;

- Defendant never gave Boxum and Moore any chance to respond to or explain any allegations against them related to the alleged emails used to terminate their employment;

- Defendant never showed any of the alleged emails to Boxum and Moore;

- Defendant did not document any conclusions from investigation.

Instead, on August 2, 2010, only about two weeks following Plaintiffs' report of race discrimination against a vulnerable co-worker and the widow of a murder victim, and a few weeks following their report of sex discrimination against a breast-feeding co-worker, Defendant Taylor fired both Plaintiffs, who he clearly viewed as unsavory, "nasty" women who had meddled, complained, and raised legal issues he "didn't need to be dealing with."  The evidence in this case presented an overwhelmingly powerful example of the worst kind of discriminatory and retaliatory motives at work.  The jury's verdict should be set aside and a new trial granted so that Plaintiffs may receive justice.

### III.     ERRORS WARRANTING A NEW TRIAL.

In addition to the overwhelming evidence demonstrating plaintiffs were subjected to sex discrimination and retaliation in their terminations, two specific errors warrant granting a new trial for plaintiffs.  First, the defendant was permitted to confuse the jury with the improper and legally insufficient claim that plaintiffs were "personal staff" of DA Taylor as an "elected official" and therefore not subject to Title VII.  Although the jury ultimately rejected this legal defense--only after being further directed by the Court to decide this issue--this legal issue was extremely confusing and may well have improperly influenced the jury in favor of Defendant.  Second, the admission of evidence about Plaintiff Moore's sexual orientation improperly invaded her Constitutional privacy rights and injected a highly irrelevant and prejudicial issue into the trial of this matter.  For these additional reasons, a new trial should be granted here.

### a.     Claimed Personal Staff Exemption

From the very beginning of this case, Defendant's core defense was the illogical and untenable position that plaintiffs, the lowest level staff in the DA's office, were exempt from Title VII's protections because they were the personal staff of the DA, an elected official with essentially unlimited plenary powers.  This issue was inserted repeatedly into the trial, from defendant's opening statement to its examination of virtually every witness in this matter, to the jury instructions and the parties' closing arguments.  Throughout, defendant attempted to improperly paint a picture that plaintiffs held such important, sensitive positions that they were exempt from Title VII.  From the sequence of the jury deliberations here it is impossible to know how this improper and legally untenable position may have influenced the verdict.

18

At the beginning of the trial before opening statements, the Court indicated it believed the persona staff defense was not plausible and orally ordered defendant to show cause why the defense should not be stricken.  Defendant made an oral proffer which the Court again indicated it believed was insufficient, yet did not strike the defense and Defendant proceeded with this line of attack against all witnesses throughout plaintiffs' case in chief.  Plaintiffs moved pursuant to Rule 50(a) of the Federal Rules of Civil Procedure to enter judgment as a matter of law in their favor on the affirmative defense of the "personal staff" exception to Title VII, both at the close of plaintiffs' evidence and at the close of all the evidence.  Plaintiffs specifically asked the court to preclude defendant from raising the affirmative defense of the personal staff exception in jury instructions and later argument because defendant had failed to meet its burden.  However, the Court took the motion under advisement and did not grant the motion and defendant continued with its improper and untenable line of misleading arguments to the jury.

Judgment as a matter of law is appropriate under Fed. R. Civ. P. 50(a) if "a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue."  This Court was required to "enter judgment as a matter of law in favor of the moving party if there is no legally sufficient evidentiary basis with respect to a claim or defense under the controlling law."  *Harsco Corp. v. Renner*, 475 F.3d 1179, 1186 (10th Cir. 2007); *see also Kelley v. City of Albuquerque*, 542 F.3d 802, 806-07 (10th Cir. 2008) (finding that "from the evidence submitted, no reasonable jury could find that [plaintiff] was covered by the 'personal staff' exemption to the definition of 'employee' under Title VII").

A claim that the "personal staff" exception to the definition of "employee" under Title VII applied to plaintiffs was an affirmative defense. Therefore, "[t]he defendant bears the initial burden of demonstrating that the personal staff exception applies." *Oden v. Oktibbeha Cty.*, 246 F.3d 458, 467 (5th Cir. 2001).

To meet its burden, defendant needed to show that plaintiffs were not "employees" under the extremely narrow "personal staff" exception of Title VII, 42 U.S.C. § 2000e(f), by establishing that the "personal staff" exception should apply based on the six *Teneyuca* factors. *Nichols v. Hurley*, 921 F.2d 1101 (10th Cir. 1990) (applying the six-factor test outlined in *Teneyuca v. Bexar Cnty.*, 767 F.2d 148, 151 (5th Cir. 1985)). The six factors include: (1) whether the elected official has plenary powers of appointment and removal, (2) whether the person in the position at issue is personally accountable to only that elected official, (3) whether the person in the position at issue represents the elected official in the eyes of the public, (4) whether the elected official exercises a considerable amount of control over the position, (5) the level of the position within the organization's chain of command, and (6) the actual intimacy of the working relationship between the elected official and the person filling the position. *Teneyuca*, 767 F.2d at 151. As this Court has acknowledged, the Tenth Circuit has instructed courts *to construe the personal staff exception narrowly to exempt only those individuals who are in highly intimate and sensitive positions of responsibility. See Owens v. Rush*, 654 F.2d 1370, 1375 (10th Cir. 1981) (citing *Teneyuca*, 767 F.2d at 152). [Doc. 99, p.19.]

Here, defendant failed to meet its burden by showing Plaintiffs were members of defendant's "personal staff," and no reasonable jury could have found otherwise based upon the evidence presented at trial. As previously outlined in plaintiffs' briefing in response to

defendant's motion to dismiss [Docs. 16 & 30] and motions for summary judgment [Docs. 87 & 88], and in Plaintiffs' Trial Brief addressing the personal staff exception [Doc. 130], and incorporated herein by reference, plaintiffs maintain that defendant could not meet its burden of demonstrating that the "personal staff" exemption" applies to plaintiffs. In the interest of judicial economy, plaintiffs incorporate by reference the relevant portions of Documents 16, 30, 87, 88, and 130 and their Rule 50 motions addressing this issue (and in particular the sections addressing the *Teneyuca v. Bexar Cnty.*, 767 F.2d 148, 151 (5th Cir. 1985) factors, in light of *Nichols v. Hurley*, 921 F.2d 1101 (10th Cir. 1990)) and point out to the Court that none of the testimony or evidence presented at trial by defendant was any different than that presented in defendant's motion to dismiss and motion for summary judgment.

As the Court knows, the jury first returned with verdicts for defendant without having answered the question on the verdict forms as to the applicability of the personal staff exemption. Only after the jury was sent back to answer this question did they return with the verdict that this exemption did not apply. However, it is entirely possible that the verdict here may have been the result of an improper compromise with those jurors in favor of Plaintiffs ultimately conceding liability in order to obtain a determination that the personal staff exemption did not apply.

Moreover, the evidence at trial was improperly prejudiced against plaintiffs by defendant's repeated injection of the argument that plaintiffs were not protected by Title VII. This line of evidence and argument improperly predisposed the jury to believe that if plaintiffs were in any way protected by Title VII, it must be in some lesser fashion than other employees who are not subject to the all-encompassing power of an elected official. Because the evidence

21

and arguments offered by defendant concerning the "personal staff" exemption were erroneous and prejudicial to plaintiffs, the court should grant a new trial on all issues.

### b.  Sexual Orientation Evidence.

Certain emails contained in defendants' Investigation File referred to Ms. Moore's sexual orientation as a lesbian.  They included comments about her dating a female individual and an attempt to get a date with another woman.  Plaintiffs moved in limine to exclude evidence of Moore's sexual orientation, or that of any trial witness, because such was completely irrelevant to any issue in this case, and should be excluded under FRE 401, 402.  Plaintiffs showed how the emails at issue could easily be redacted while still preserving the right of defendant to make any appropriate arguments it wished to make about the propriety of the emails, since defendant conceded that it had not relied on information about sexual orientation in any termination decisions.  Defendant objected to this request but was not able to articulate any legitimate reason that redacting the requested information from the emails would improperly limit its defense.  The Court overruled plaintiffs' motion and therefore the issue was unnecessarily injected into the trial of this case.

Sexual orientation is a cultural issue that brings out strong emotions all over the spectrum.  Unless it is part and parcel of the legal claims or defenses in a case, which it was not here, any probative value of this evidence was substantially outweighed by the danger of unfair prejudice to plaintiffs, and should have been excluded under FRE 403.  Regardless of the questions asked and answers given in Voir Dire, there is a substantial likelihood that this legally irrelevant detail of Ms. Moore's life improperly and unfairly influenced one or more jurors' evaluation of the true issues in this case.

Plaintiffs submit that the proposed email redactions were appropriate under FRE 403 as they would have permitted the defendant to fully argue its position about the claimed impropriety of the emails, and yet exclude what was surely a very complicated and highly prejudicial injection of irrelevant information about sexual orientation to this case. The redactions would also have served the important purpose of protecting the privacy of non-parties to this litigation as well as the privacy of Ms. Moore in this set of irrelevant facts. As the Tenth Circuit has held, "this constitutionally protected right [of privacy] is implicated when an individual is forced to disclose information regarding personal sexual matters." *Eastwood v. Department of Corrections*, 846 F.2d 627, 631, 1988 (10th Cir. Okla. 1988).

Defendant's objection to redacting the references to sexual orientation boiled down to an alleged concern that redacting these references would "leave the jury to speculate about the omitted words." Yet irrelevant or prejudicial information is routinely redacted in trial exhibits without any such concern. Indeed, the same was accomplished in this very trial with other exhibits, including the defendant's investigation notes which contained irrelevant and possibly prejudicial accusations about plaintiffs' medical records and alleged medical diagnoses, and defendant raised no concern that such redactions would cause the jury to unduly speculate about the contents of the redacted information. The inescapable conclusion here is that Defendant hoped to gain an improper advantage from unspoken biases that the jurors may have harbored towards plaintiffs based on Ms. Moore's sexual orientation.

Plaintiffs submit that a simple explanation from the Parties or the Court that irrelevant material concerning non-parties to this case had been redacted would have easily explained the redacted emails to the jury. In short, the proposed redactions would have properly mitigated

plaintiffs' concerns about privacy and prejudice while in no way prohibiting the defendant from making any argument that it legitimately intended or needed to make to defend itself.  Plaintiffs request to exclude such inflammatory and prejudicial evidence was denied, thus improperly and unnecessarily invading the constitutional privacy rights of plaintiff Moore and third parties, and therefore a new trial should be granted so that this prejudicial error may be corrected.

## CONCLUSION

For all the foregoing reasons, plaintiffs request the court grant this motion and order a new trial on all issues in this case so that justice may be done.

Respectfully submitted,

**SIRO SMITH DICKSON PC**


By  /s/ Eric W. Smith
  Eric W. Smith      KS #16539
  Rik N. Siro      KS FED #77812
  Athena M. Dickson    KS #21533
  Raymond A. Dake    KS FED #78448
  1621 Baltimore Avenue
  Kansas City, Missouri  64108
  816.471.4881 (Tel)
  816.471.4883 (Fax)
  esmith@sirosmithdickson.com (email)
  rsiro@sirosmithdickson.com (email)
  adickson@sirosmithdickson.com (email)
  rdake@sirosmithdickson.com (email)

  **ATTORNEYS FOR PLAINTIFFS**

24

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that the above and foregoing was electronically filed with the Clerk of the Court using the CM/ECF filing system on February 14, 2017, which system sent notification of such filing electronically to the following counsel of record:

> Mr. David R. Cooper
> Mr. Seth A. Lowry
> Fisher Patterson Sayler & Smith LLP
> 3550 S.W. 5th Street
> Topeka, Kansas 66606
> dcooper@fisherpatterson.com
> slowry@fisherpatterson.com
> ATTORNEYS FOR THE OFFICE OF THE DISTRICT
> ATTRONEY FOR THE THIRD JUDICIAL DISTRICT

>     /s/  Eric W. Smith
> ATTORNEY FOR PLAINTIFFS

25